IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2017 Session

IN RE P.T.F.

**Appeal from the Juvenile Court for Knox County**
**No. 148322   Timothy E. Irwin, Judge**

_____

**No. E2016-01077-COA-R3-PT**

_____

In this termination of parental rights case, the Department of Children's Services filed a petition to terminate the parental rights of T.W.B. (mother) with respect to her child, P.T.F.[1] The trial court found clear and convincing evidence of two grounds supporting termination. By the same quantum of proof, the trial court held that termination of mother's parental rights is in the best interest of the child. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, T.W.B.

Herbert H. Slatery III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

During mother's pregnancy, mother failed three drug screens, testing positive for marijuana on two occasions and twice for opiates. Mother admitted at trial that she used oxycodone without a prescription several times a week during the first three months of

_____
[1] DCS filed a separate petition to terminate the parental rights of the child's father. His rights were terminated on December 1, 2015 and are not at issue on this appeal.

her pregnancy. On July 3, 2014, DCS sent an investigator for the Office of Child Safety to the hospital to observe the child and interview mother. Following the investigation, DCS had concerns about the safety of the child. It determined that she needed to be placed with a care-provider. On July 4, 2014, the trial court entered a protective custody order finding the child to be dependent and neglected. The court awarded temporary custody to DCS. The child has remained in foster care since that date.

On October 15, 2014, the trial court entered a child support order requiring mother to pay child support in the amount of $100 per month. The court also found that mother owed a child support arrearage of $225, which included retroactive support to July 3, 2014. The court ordered mother to pay $10 per month toward the arrearage for a total monthly child support obligation of $110.

On October 13, 2015, DCS filed a petition to terminate mother's parental rights. In the petition, DCS alleged the following grounds for termination: (1) severe child abuse pursuant to Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(22); (2) abandonment by willful failure to support pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); (3) abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (4) persistence of conditions pursuant to Tenn. Code Ann. §§ 36-1-113(g)(3); and (5) substantial noncompliance with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). DCS also asserted that termination of mother's parental rights is in the best interest of the child.

On August 31, 2016, the trial court entered its final judgment terminating mother's parental rights, finding that there was clear and convincing evidence of severe child abuse and abandonment by mother's willful failure to support. However, the court determined that DCS had not met its burden of proving abandonment by failure to provide a suitable home, persistence of conditions, or substantial noncompliance with a permanency plan. The court found clear and convincing evidence that termination is in the child's best interest. Mother appeals.

## II.

Mother raises the following issues on appeal, as taken verbatim from her brief:

> Did the [trial] court err in finding that the termination of parental rights ground of severe child abuse has been established?

> Did the [trial] court err in finding that the termination of parental rights ground of abandonment by failure to support has been established?

- 2 -

Did the [trial] court err in finding that termination of [mother's] parental rights is in the best interest of her child?

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges

these findings on appeal.")

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

### A.

#### i.

As previously noted, DCS sought to terminate mother's parental rights based upon severe child abuse. In its petition, DSC alleged that

> [t]his child was removed from the parents' custody due to unresolved substance abuse issues, domestic violence in the home, and mental health issues. During the pregnancy [mother] had taken opiates, without a prescription, despite

knowing that such use was dangerous and could cause harm to her baby.

The trial court found clear and convincing evidence that mother had taken drugs during her pregnancy, despite knowing the adverse effects that it could have on the child. In making its ruling, the trial court stated the following:

[T]aking drugs in six months of pregnancy knowing the adverse effects that it could have[.] It doesn't have to have [adverse effects], it just could have. You got lucky here. You stopped it, sounds like, which is great. But is that still severe child abuse? Yeah it is. Absolutely severe abuse. . . . [T]he questions that were posed to the doctor, she's trying to answer from a scientific basis. She doesn't even know or understand the legal ramifications or issues. She doesn't know about the precedence . . . ; a year, and it's April 9th, and full term for using July, and you still tested positive for opiates? In this court, that's enough.

The trial court's final decree of termination explained that

[the expert] testified that opiates or marijuana by themselves are not dangerous, but that there are potential long-term neurological consequences and the possibility of growth retardation from the use of opiates during pregnancy. . . . She also testified that, in her experience, among the population of drug abusing women that she sees in her practice, other risks attend the drug use, including not knowing what you are putting in your body when you buy drugs off the street; risking overdose when not taking medication under a doctor's care; short of overdose, risking impairment that could cause accidental injury to the fetus if the mother falls or drives impaired; and risks associated with taking the drugs in a manner not prescribed such as snorting or IV use. Nothing in [the expert's] testimony causes this [c]ourt to deviate from the long history of appellate cases in Tennessee that set forth the requirements for making a finding that the mother severely abused her child by her abuse of drugs in pregnancy, knowing that such abuse presented a risk of harm to her child.

The mother's own testimony revealed that she used drugs during the first trimester of her pregnancy, and taking her testimony in the most favorable light to the mother, she used

- 5 -

during the first month following her knowledge that she was pregnant. She used Oxycodone and marijuana during that time frame.

\*        \*        \*

The mother knew the risk of harm associated with her abuse of drugs during this pregnancy and continued to use such drugs exposing her child to the risk of serious bodily injury or death.

(Paragraph numbering in original omitted.) The court concluded that mother committed severe child abuse against the child.

**ii.**

The evidence does not preponderate against the trial court's finding of severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4) allows for termination of parental rights when

> [t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tenn. Code Ann. § 37-1-102(b)(22) defines severe child abuse as

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> > (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d)
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe phychosis, severe neurotic disorder, severe depression, severe developmental delay or

intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct.

Tenn. Code Ann. § 39-15-402(d) provides the following:

"Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

On appeal, mother acknowledges that "[t]his Court has upheld, in a multitude of cases, that a mother's use of drugs while pregnant can support a finding of severe child abuse." She argues, however, that, in the cases cited by the trial court and in a string of cases she cites in her brief, "the facts in all of these cases much more clearly and convincingly support a finding of severe abuse than do the facts of the case at bar." Her argument is not persuasive. The issue before us is not whether the evidence in this case is lesser than that in other cases. The issue is simply whether the evidence clearly and convincingly shows severe child abuse. Mother has failed to demonstrate how the evidence in this case preponderates against the trial court's finding of clear and convincing evidence. Furthermore, she has failed to distinguish these cases from her case other than to say that the specific drugs in those cases were more harmful and/or that the child suffered some specific harm. Instead of citing authority for her argument that her prenatal drug use does not constitute severe child abuse, mother cites numerous cases in which this Court upheld a finding that prenatal drug use constituted severe child abuse. To us, those cases demonstrate the uniform view of this Court that prenatal drug use does, in fact, constitute severe child abuse.

Mother focuses on the fact that her prenatal drug use did not cause serious injury to the child. She argues that her expert "testified that mother's drug use, as evidenced in her and [the child's] records, would not likely cause any of the injuries enumerated in Tenn. Code Ann. § 39-15-402(d), nor would it likely cause injuries of similar severity to those enumerated in said statute." She emphasizes the fact that, according to her expert, "[t]he only potential long term effects on [the child are] problems with attention and hyperactivity." Mother concludes that the evidence "does not even suggest that [her] drug use is likely to cause any harm at all, let alone serious bodily injury or death[.]"

This Court, however, has found severe child abuse in the absence of an injury to or long-term effects on a child. "Severe abuse can be present even where the child does not manifest any lasting physical effect from mother's use of drugs." *In re Envy J.*, No.

W2015-01197-COA-R3-PT, 2016 WL 5266668, at *12 (Tenn. Ct. App., filed Sept. 22, 2016). We have found that, even when a child enjoys a healthy childhood, "the healthy development of the child . . . does not diminish the severity of the harm to which the child was exposed." *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App., filed April 14, 2005). "[P]renatal abuse of controlled substances constitutes severe child abuse, whether or not the child actually suffers harm." *In re Shannon P.*, No E2012-00445-COA-R3-PT, 2013 WL 3777174, at *5 (Tenn. Ct. App., filed July 16, 2013). A child has the right "to begin life free from the impairment of drug addiction and other ill effects of prenatal drug abuse." *In re Benjamin M.*, 310 S.W.3d 844, 849 (Tenn. Ct. App. 2009).

At trial, mother's expert testified that neither opiates nor marijuana alone is likely to cause serious bodily injury. With regard to prenatal drug use and the likelihood of harm to the child, the expert testified as follows:

> Perhaps the more concerning part of it is the behavior around how they're getting meds and where they're getting them from.
>
> \* \* \*
>
> [Y]ou're still putting yourself in a situation where who knows where they're getting their drugs from, and that is perhaps an issue in itself.
>
> \* \* \*
>
> I think it's probably not necessarily the drugs themselves unless we're talking overdose. That could potentially lead to, obviously, mother injury leading to fetal injury. So if they're using drugs to the extent of overdose, of course that could lead to serious injury.
>
> \* \* \*
>
> [A]s I tell anybody who comes to me on any medication, the less influence you have from anything the less you have to worry about, or the less factors you have affecting neuro development.
>
> \* \* \*
>
> Even according to the Pediatric Journal there are some long-

- 8 -

term neuro developmental effects, such as attention and hyperactivity.

When the trial court questioned the expert as to whether "in utero drug exposure to an opiate [can] cause severe psychosis, severe neurotic disorder, severe depression, severe developmental delay, intellectual disability, or severe impairment of a child's ability to function adequately in the child's environment[,]" the expert gave the following testimony:

> [In a Pediatric article, t]hey specifically talk about neuro behavior, and the long-term effects, they talk about several things in the article; one of the things is learning and cognition. And they acknowledge the fact that there have been some studies that have an effect on IQ and learning and developmental, major developmental issues.
>
> But, they say there is no consensus on the effect of opiates on long-term significant learning disabilities. And that there's not enough literature to talk about it in terms of . . . other learning and cognition I think.

This testimony supports a finding that mother's prenatal drug use constitutes severe child abuse. According to the expert, there is no consensus on the long-term effects of mother's prenatal drug abuse. While the child here may develop normally, the expert testified that there could be attention and hyperactivity issues. It is unclear what other long term effects may develop. This Court has consistently upheld termination of a mother's parental rights on the ground of severe child abuse when she has used drugs during pregnancy. We hold, as a matter of law, that the evidence does not preponderate against the trial court's finding of clear and convincing evidence supporting termination of mother's parental rights based on severe child abuse.

**B.**

**i.**

The trial court found that DCS had proven a ground for termination based upon mother's willful failure to support the child. In the petition to terminate mother's parental rights, DCS alleged that mother

> has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of this petition. During the previous five months, [mother] has made only one

contribution toward the support of this child, on May 8, 2015, despite reporting continuous employment.

The trial court found clear and convincing evidence supporting this ground. In making its ruling, the trial court made the following findings:

> [DCS] proved source of income, they proved knowledge that you're supposed to be making a payment. Now, the way the [m]other forgot or not is pretty much irrelevant. . . .
>
> If I forget to pay . . . for four months, [the child] is not going to have the things they need. . . . [DCS] proved that ground, there's not much question about that.
>
> [DCS] proved the willful part of it, because Mom was employed. They didn't talk about how much she made but the child support was only $110 a month. She didn't pay that once in the four months that count.

In the final decree of termination, the court found that

> mother paid no child support for the months of June, July, August, September, and October, 2015.
>
> . . . The mother provided [the caseworker] information leading [her] to conclude that the mother was always employed during the time that her daughter was in the custody of the Department. . . .
>
> The mother never reported any dates of unemployment to [the caseworker]. . . .
>
> [Mother] testified that she 'thought the support would get deducted out of my checks,' because this had been her experience in the past, and, as far as she knew, child support was being deducted out of the father's paycheck. She testified that she did not make a voluntary payment until December 2015. She also testified, under questioning by her attorney, that she had stable employment.
>
> *     *     *
>
> . . . Based on the testimony, she appears to have always been

- 10 -

employed during the relevant time frame. Mother did not pay any child support in the relevant time and she had the ability to do so. She never testified that she could not afford to pay. She testified that she just did not realize that the payments were not being taken out. However, she acknowledged receiving a copy of the order and that the order has the information on how to ensure payment. Presumably she also would be able to look at her own pay stubs and determine if child support had been taken out. Mother also had access to TESES to determine if her child support was being paid.

(Paragraph numbering in original omitted.) Based on the facts, the trial court found that mother's failure to support the child. was willful and that DCS had proven, by clear and convincing evidence, that mother willfully failed to support the child.

### ii.

Tenn. Code Ann. § 36-1-113(g)(1) allows a court to terminate parental rights when the parent has abandoned the child, as defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-102(1)(A)(i) defines "abandonment" to include the following:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights . . . , that the parent . . . ha[s] willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child[.]

Because DCS filed the petition to terminate mother's parental rights on October 13, 2015, the relevant four-month period runs from June 13, 2015 through October 12, 2015. Mother admits in her brief that "there is no doubt that [she] failed to make any child support payments during the relevant period." Mother, however, argues that her failure to pay support should not be classified as "willful." In her brief, she argues the following:

She simply thought that her child support payments were coming out of her paychecks, because they had come out of her paychecks in her previous case with DCS, and child support payments were coming out of . . . father's paychecks. Her failure to pay was accidental and inadvertent, not willful.

This Court has found the following regarding the "willfulness" of a parent in

- 11 -

failing to support a child:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to . . . support a child is "willful" when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and had no justifiable excuse for not doing so. . . .
>
> The willfulness of particular conduct depends on the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App., 2005) (internal citations omitted.) "Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness." *In re Neylan H.*, No. E2015-02444-COA-R3-PT, 2016 WL 7477740, at *10 (Tenn. Ct. App., filed December 29, 2016).

It is undisputed that mother did not make any child support payments during the relevant four-month period. At trial, mother testified that she has maintained stable employment since the child was born. Her reason for failing to make child support payments was that she thought the payments were coming out of her pay. This does not excuse mother from her obligation of making child support payments. Mother had avenues available to determine that she was actually meeting her child support obligation. She did nothing.

The trial court witnessed mother's testimony at trial and made a determination based on that testimony and the facts in the case that mother's failure to pay child support was willful. The trial court was best positioned to make that determination. *Id.* Based on the testimony at trial, the trial court held that DCS had met its burden of proving that mother's failure to pay child support was willful.

We find that mother's belief that child support was being deducted from her checks does not negate the "willfulness" of her failure to pay support. Mother provides no justification for her failure to take any action to ensure that she was paying child support as ordered. Mother had access to her paycheck stubs to determine whether any support was being deducted from her checks. She could have taken any number of steps to verify that she was fulfilling her child support obligation. Mother, however, chose to take no action after being ordered to pay child support to ensure that she was paying child support. This failure to act on mother's part was willful. There was no testimony indicating that mother had been misled to believe that her payments were being automatically deducted. The evidence does not support mother's claim that her failure to support the child was accidental or inadvertent. We fail to see how mother's inaction should excuse her failure to make the required payments.

In her brief, mother asserts that "when she found out that child support was not coming out of her checks, she paid and filed her taxes, knowing that her tax refund would go towards child support." This fact is irrelevant to our analysis of the issue. Tenn. Code Ann. § 36-1-102(1)(F) provides that "[a]bandonment may not be repented by resuming . . . support subsequent to the filing of any petition seeking to terminate parental . . . rights[.]" Tenn. Code Ann. § 36-1-102(1)(F). Accordingly, mother's subsequent filing of her taxes has no bearing on this case. We hold, as a matter of law, that the evidence does not preponderate against the trial court's finding that mother willfully failed to support the child during the four months immediately preceding the filing of the petition to terminate her rights.

**C.**

As previously stated, the Supreme Court has determined that "the Court of Appeals must review the trial court's findings as to each ground for termination . . . , regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. The Court explained that this mandatory review of each ground "will ensure that fundamental parental rights are not terminated except upon sufficient proof, proper filings, and fundamentally fair procedures." *Id.* at 525.

This Court focuses on the parent whose rights are subject to termination and the protection of those fundamental rights. The Court removes the burden from a parent of challenging each ground in the case. Because this automatic review is done to protect a parent's fundamental rights and removes the burden of challenging each of the trial court's findings on appeal, we interpret the Supreme Court's holding to be for the benefit and protection of the parent whose rights are subject to termination. Accordingly, we find that *In re Carrington H.* requires the Court of Appeals to review each ground of which the trial court found clear and convincing evidence supporting termination of the parent's rights. However, we do not read that decision to require the Court of Appeals to review those grounds for termination that the trial court found were not supported by

- 13 -

clear and convincing evidence. This is not to say that DCS may not appeal the trial court's findings with regard to grounds that a trial court finds the agency failed to prove. DCS can challenge those decisions and secure full appellate review. But, in the absence of such a challenge, those grounds will not be reviewed by us. The trial court found that DCS failed to prove grounds of abandonment for failure to provide a suitable home, persistence of conditions, or substantial noncompliance with permanency plan by clear and convincing evidence. DCS has not challenged the trial court's findings as to any of these grounds. Accordingly, we will not review the trial court's findings with respect to these grounds.

## V.

## A.

Since we have found statutory grounds warranting the termination of mother's parental rights, we now focus on whether termination is in the child's best interest. When considering the issue of "best interest," we are guided by the following statutory factors as set forth in Tenn. Code Ann. § 36-1-113(i), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)).  In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

In the present action, the trial court held that termination of mother's parental rights is in the best interest of P.T.F.  The court found the following in making that determination:

[T]he Court believes that removing the child from the only family she has known for her entire life, who have had a 24 hour a day, 7 day a week responsibility to her, would be detrimental to her emotional well-being.

The mother currently has made some adjustment in her circumstances by refusing to allow the father to live with her

- 15 -

and by discontinuing her use of opiates. . . .

The mother has visited regularly, but only at those visits that [DCS] provided. The mother, however, took advantage of almost none of the three additional visits per week offered by the foster family.

The mother does have a meaningful relationship with the child, but it pales in comparison to the relationship the foster family has to the child . . . .

[A] change in caretakers would be devastating to this little girl. . . .

Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the household – this sounds like [father], but since he is not in the home, it is neutral. However, along with the finding of severe abuse comes the detriment to mother of this best interest factor ground weighing against her.

[The child] is entitled to a safe, secure and loving home. [The child] has been in the custody of the same foster parents since being placed in the custody of [DCS]. She has known no other mother or father or family than this foster family who have opened their home and their heart to [P.T.F.] this past 21 months.

She has become integrated into the foster family and she is thriving in their care.

(Paragraph numbering in original omitted.) Based upon these findings, the trial court found that DCS had proven, by clear and convincing evidence, that termination of mother's rights is in the best interest of P.T.F.

## C.

The evidence does not preponderate against the trial court's finding that termination of mother's parental rights is in the child's best interest. It appears that mother has made an adjustment to her circumstances to make it safe for the child to be in the home. The record indicates that mother has quit using drugs and has made a decision

to exclude father from her life. These adjustments, however, do not overcome the negative effects that placing the child with mother would have. Mother has not established a meaningful relationship with the child. While she has been in contact with the child and visited her, she has not taken the extra step of taking advantage of the additional visitation hours that the foster family has made available to her. She has not taken the steps to cultivate a meaningful relationship with the child. Because mother lacks this meaningful relationship with the child and the foster family has been the only family that she knows, changing the child's caretaker would likely have a detrimental effect on the child. Additionally, mother has failed to provide support for the child.

While mother has left father, so it does not appear that mother is residing with someone he has shown brutality, physical, sexual, emotional, or psychological abuse to the child, we have found that her conduct during pregnancy constitutes severe child abuse. While mother appears to be emotionally stable such that her mental condition would not prevent her from providing safe and stable care to the child, this does not overcome the detrimental effect of removing the child from her home and changing her caretaker. Additionally, mother has refused to provide any information regarding her boyfriend to determine whether it would be detrimental for the child to be around him. Based on our analysis of these factors, we hold, as a matter of law, that termination of mother's parental rights is in the best interest of the child.

## VI.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, T.M.B. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE